# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MANUEL GALVAN, | ) | |
| | ) | |
| Plaintiff, | ) | No. 04 C 4003 |
| | ) | |
| v. | ) | Judge Edmond E. Chang |
| | ) | |
| THOMAS NORBERG AND ALAN LUCAS, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

Manuel Galvan filed this § 1983 action against Thomas Norberg and Alan Lucas, two Chicago police officers, seeking damages arising from a traffic stop, car search, and most significantly, his arrest.[1] After a one-week jury trial, which occurred over 6 years after the December 2002 arrest, the jury returned a verdict in favor of Defendants. Galvan moved for a new trial under Rule 59, R. 148,[2] and the motion was granted before Defendants responded. R. 151. Defendants have moved to reconsider the Court's grant of a new trial and ask the Court to reinstate the jury verdict in favor of Defendants. R. 154. For the reasons discussed below, the motion to reconsider is granted and the jury verdict for Defendants is reinstated.

---

[1]This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

[2]Citation to the record is "R." followed by the docket entry number. Citations to the trial transcript are [Month/Day, AM or PM] Tr. at [Page]. The transcripts of the trial can be found at R. 171-186. Non-substantive, typographical corrections have been made to the transcripts.

# I.

As explained below, in the order granting a new trial, the Court held that Officer Lucas had fabricated an anonymous tip to justify, after-the-fact, the traffic stop and arrest of Galvan. Defendants' motion to reconsider the new-trial grant requires an assessment of the trial evidence, with a particular focus on the anonymous tip.

## A. The Anonymous Tip

### 1. Officer Lucas' Testimony

Lucas testified that he arrived early to the police station on December 30, 2002. 8/3 PM Tr. at 23-24. While socializing near the front desk, Lucas answered a phone call. *Id.* The caller asked if any "narcs" were working, a term which Lucas knew referred to a tactical officer. *Id.* at 26-27. After answering that there were none available, the caller asked if a "blue belly" was available. *Id.* at 27-28. Lucas knew "blue belly" to be slang for a police officer. *Id.* After Lucas answered that he was a police officer, the caller said that he had information regarding a large quantity of cannabis being transported. *Id.* Before this tip, Lucas had received numerous anonymous tips before. 8/4 PM Tr. at 102 ("I can't put a number on it. I mean it could be 100, 200, 250. It could be a little less.").

According to his trial testimony, Lucas remembered that the informant provided the following information. "Two dudes" would be driving in a "tricked out" and "shiny clean" black pickup truck. 8/3 PM Tr. at 30-31. Lucas asked if he was looking for a "full trick" or a "half trick" pickup. *Id.* Lucas explained at the trial that, in his opinion, a "full trick" is a vehicle that has been elevated from its factory height with special

wheels and loaded with aftermarket modifications. *Id.* at 31. A "half-trick" ride will also have some modifications, but not to the same extent; one might expect extra chrome, running boards, and/or some special paint. *Id.* The caller indicated that this would be a "half trick" pickup. *Id.* Lucas further testified at trial, after noting that the arrest had occurred long before trial, that the informant said the truck would be headed from north to south on Pulaski in the vicinity of Irving Park Road. *Id.* at 32. Furthermore, the informant stated that "the truck would be in the [area from the] time frame of 4 or 5 o'clock in the evening until 6 o'clock or thereabouts . . . ." *Id.* According to his testimony at trial, Lucas could not recall whether the race or nationality of the truck's occupants was told to him. *Id.* at 34-35. Lucas was then shown a copy of his deposition from March 2005 where he testified that the informant told him that the occupants would be Hispanic. *Id.* at 36-37. Lastly, Lucas remembered being told an approximate age of the occupants, but could not remember specifics: "I believe he gave me an age, I am guessing, I think he said between 25 and 30, 25 or 35, something like that." *Id.* 38. He reiterated his uncertainty about the age later in testimony: "[h]e said 25 to 30 or 35." 8/4 AM Tr. at 19; 8/4 PM Tr. at 93. In an earlier deposition, he testified, "I think I asked him how old they were, and he told me 25 or 30." 8/4 AM Tr. at 21. The actual ages of the occupants on the date of arrest were 21 (Juan Luna) and 42 (Plaintiff Galvan). 8/4 PM Tr. at 94; 8/6 AM Tr. at 166.

Lucas considered the tip credible given the informant's natural way of speaking, the specificity of the tip, and the use of police-work and drug-related slang, specifically, "blue belly" and "narc." 8/4 PM Tr. at 123.

After receiving the tip, Lucas went to "roll call" in the police station's basement. 8/3 PM Tr. at 42. At trial, Lucas testified that he did not tell anyone about the tip on his way to roll call or at roll call, other than his partner, Norberg. *Id.* at 42, 46. Lucas then testified about the nature of that evening's roll call, and he could not remember any specific details, including how many officers were there, who led the roll call, or how long it lasted. *Id.* at 42-45. When asked why he did not tell his watch commander about the tip, Lucas's response at trial was "I am not sure I didn't tell the watch commander. I am not sure that I did. . . . I am inclined to say that I didn't. I could have, but I wouldn't think so." *Id.* at 46. In his March 2005 deposition, Lucas testified, "Other than talking to Officer Norberg, I don't believe I spoke to anybody else about it." *Id.* at 48. Lucas repeated his uncertainty on this point throughout his testimony. *Id.* at 50, 54.

After roll call was finished and Lucas and Norberg began their patrol, they established a moving surveillance at Pulaski and Irving Park, looking for a vehicle matching the informant's description. *Id.* at 57-58. After some time, Lucas and Norberg spotted a truck matching the description and stopped it. *Id.* at 61. According to Lucas, it was around 5:30 or 5:45 p.m. at this time. *Id.* at 64. A dispatch record reflected some activity, although it is not clear if it was the actual stop, at 5:50 p.m. 8/4 PM Tr. at 157.

### 2. Officer Norberg's Testimony

Norberg remembered that Lucas told Norberg about the tip on December 30, 2002, before roll call. *Id.* at 168-69. Norberg testified that Lucas "might have mentioned something [about the tip] to the watch commander [Probeski], but really [didn't] know for sure." *Id.* at 169. Norberg could not remember what specific details Lucas had passed on before Lucas was interrupted by the beginning of roll call. *Id.* at 173. While Norberg did not tell anyone else about tip, he was not sure whether or not Lucas told anyone else after roll call. *Id.* ("He could have talked to somebody else.") When asked whether he knew if the caller had been male or female, Norberg testified, "I believe he related to me that it was a male caller." *Id.* at 174. In an earlier deposition, Norberg testified that he did not know if the caller was male or female. *Id.* at 175. Norberg did not remember when his deposition was taken, only that "[i]t was a long time ago." *Id.*

### 3. Lieutenant Probeski's Testimony

Lieutenant Joseph Probeski was a lieutenant for the Chicago Police on December 30, 2002. 8/6 AM Tr. at 75. He served as the watch commander; the watch commander is in charge of all police activity occurring in a district for the time he is on shift. *Id.* Probeski was in charge of roll call the day Galvan was arrested. *Id.* at 79. Probeski testified that he had been told about the anonymous tip. *Id.* at 82. Probeski remembered discussing the anonymous tip with Lucas, but could not recall if he also discussed it with Norberg. *Id.* The discussion of the tip was only a few minutes, *id.* at

5

84, but Probeski remembered Lucas providing the following information: (1) Lucas had received an anonymous tip about a large movement of cannabis; (2) the cannabis would be in a pickup truck; and (3) Lucas told Probeski the location and description of the truck, but Probeski could not remember those details. *Id.* at 84-85. In an undated but sworn affidavit, Probeski recounted speaking with Lucas about the tip, and included the specific details about the truck (among other things, shiny clean, tricked truck). *Id.* at 92. At trial, Probeski could not recall when he signed the affidavit, and did not even remember signing an affidavit, but he agreed that it was his signature. *Id.* Probeski remembered thinking that the tip was "fairly good," worth following-up on. *Id.* at 95. Probeski had not been deposed. *Id.* at 99.

Probeski also testified that there is no requirement or rule mandating an officer to write down an anonymous tip. *Id.* at 122. He also confirmed Lucas's estimation that the police district received roughly 15 to 20 anonymous calls/tips per day, *id.* at 123, 132, but only 25 to 50 percent are investigated depending on the tip's quality, *id.* at 132.

**B.    The Arrest and the "Cannabis"**

After seeing a vehicle matching the description of the tip, Defendants stopped the vehicle. Lucas testified that the reason he and Norberg stopped the vehicle was because it matched the tip he had received at the station. 8/4 AM Tr. at 17. When asked "was [the stop] for any kind of traffic law violation?," Lucas answered, "No. Not in my opinion, no." *Id.* Lucas did note that the truck had made a maneuver that

6

brought it to his attention: "the truck . . . darted from . . . the center lane to the far right lane as it had gone over the intersection of . . . Irving Park. [Then] it cut into the middle lane again." 8/4 PM Tr. at 125. In contrast, Norberg testified that he stopped the truck because it did not use a turn signal to change lanes. *Id.* at 184-85. Norberg also recalled that the truck moved to the right lane "quite fast." *Id.* at 185.

As Defendants approached the truck, they saw bags in flight from the driver's side of the vehicle to the floor on the passenger's side. 8/3 PM Tr. at 73-75. Lucas recovered the bags, which he believed – accurately – to contain cannabis. *Id.* at 72. Defendants then took both men out of the vehicle and searched the truck bed, where they found two bales of plant material wrapped in plastic. 8/4 AM Tr. at 36-37. One of the bags was ripped, exposing its contents. *Id.* at 37. After looking at the material and burning and smelling the material, Defendants believed it was cannabis, as the tip had predicted. *Id.* at 39-41. Luna and Galvan insisted – accurately – that it was hay. *Id.* at 40. Despite these objections, Defendants believed the material was cannabis, and they arrested Galvan and Luna and took the vehicle and suspect-cannabis to the police station. *Id.* at 132.

An arrest report was prepared after Luna and Galvan were arrested. 8/4 AM Tr. at 25. The report referred to the anonymous tip and some of the details Lucas said the tip contained. *Id.* at 25-26; Pl. Exh. 24; Def. Exh. 9. Specifically, the report included the color of the vehicle, that the vehicle would be a pickup truck, the area where the truck would be located, and that the truck would contain 200 pounds of cannabis. *Id.* Further

7

details describing the truck and its occupants were not included in the report. *Id.* The officers testified that the report was lacking details because it was simply a summary. 8/4 PM Tr. at 149. The arrest occurred at 5:45 p.m., and the officers signed the arrest report at around 8 p.m. that evening. Pl. Exh. 24; Def. Exh. 9 (referring to 1745 arrest time and 2000 as time of report).

Laboratory testing confirmed that the plant material was in fact hay. 8/6 AM Tr. 8/6 at 23. The material arrived at the lab on December 31, 2002. 8/6 AM Tr. at 29. It was tested on January 2, 2003. *Id.* Because the laboratory results were not properly communicated, Galvan and Luna were not released until January 23, 2003. 8/7 AM Tr. 8/7 at 10.

**C.  Grant of New Trial Before Defendants Could Respond**

Galvan filed this suit in June 2004. R. 1. The jury trial began on August 3, 2009, and continued through August 11. The Court instructed the jury during the mid-afternoon of August 11, *see* 8/11 PM Tr. at 67, and the jury returned a verdict for Defendants later that same day, R. 145.

On August 20, 2009, Galvan moved for judgment as a matter of law and, in the alternative, for a new trial. R. 148. The motion for a directed verdict was denied, but the Court granted the motion for new trial in open court on September 2. R. 151. The Court had not ordered a written response from Defendants before convening the motion

hearing on September 2, and did not provide defense counsel an opportunity to respond to the motion before granting it in open court. 9/2 Tr. at 11, 13.[3]

The Court believed that the testimony about the anonymous tip "represented the most distressing falsehoods coming from the mouths of some members of the Chicago Police Department . . . ." *Id.* at 4. The Court characterized Lucas's testimony about the tip as "patently false and indeed perjurious. His account of the so-called 'anonymous tip' was nothing more as I heard it . . . a total fabrication. And the rest of his story spring boarded from that basic lie." *Id.* As for Norberg and Probeski's support, it was considered a "closing of ranks" so as "to buttress that fabrication on [Lucas's] part." *Id.*

The Court believed the anonymous tip was too good to be true, a "miracle," because "[j]ust exactly [the] kind of truck fitting the particularized description [from the caller] . . . was driving down that very street in that very direction during the specified time frame." *Id.* at 6. The Court expressed incredulity that a vehicle matching the "particularized description to a T" happened to meet nearly all of the tip's criteria, but just happened to have a bales of hay, not narcotics. *Id.* at 6. Additionally, the Court thought the story was even more unlikely because the caller knew the words "narc" and "blue belly." *Id.* at 5-6. In the Court's opinion, "to say that crediting such a patently bogus after the fact horror story is contrary to the manifest weight of the

---

[3]At the hearing's start, the Court did state that it would "probably want to hear from" defense counsel, Tr. 9/2 at 2, but then the Court granted the new trial without hearing from either side, *id.* at 11. At the hearing's end, the Court recused itself in light of the finding of perjury (discussed *infra*), asked questions concerning how the finding of perjury would be reported, and asked whether anything was unclear. *Id.* at 13.

evidence is frankly an understatement." *Id.* at 6-7. As for the additional two bags of cannabis found in the cab of the vehicle, the Court held that, standing alone, a jury could reasonably return a verdict for Defendants on this evidence, but that the officers' testimony regarding those two bags was tainted "by the big lie," and so for the verdict to rely on that evidence would also be against the manifest weight of the evidence. *Id.* at 7.

## II.

After granting a new trial, the first-assigned judge recused himself from the case pursuant to the authority granted to him by 28 U.S.C. § 294(b). 9/2 Tr. at 11. Defendants moved the newly-assigned judge to reconsider the new-trial grant. After the motion was fully briefed, eventually the case was reassigned to this Court. This Court then solicited supplemental briefs from the parties because the trial transcripts had not yet been prepared when the initial reconsideration motion was briefed. R. 191.

Before evaluating the merits of the new-trial grant, the procedural context of the reconsideration motion itself is worth discussing. The motion is *not*, despite Defendants' reference to it, R. 154 at 3, a Rule 59(e) reconsideration motion. Rule 59(e) applies only to a "judgment." Far from being a final judgment, the grant of a new trial (in civil cases) is quite the opposite: a non-final, non-appealable order that in fact vacates the final judgment typically entered pursuant to a jury's trial verdict. It is Rule 54(b) that governs non-final orders, and the rule states that such orders "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." *See also Marconi Wireless v. United States*, 320 U.S.

1, 47 (1943) (non-final orders are subject to reconsideration any time before final judgment). "A court has the power to revisit prior decisions of its own . . . in any circumstance, although as a rule courts should be loathe to so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 817 (1988) (citation omitted).

Here, the Court treads particularly carefully in reconsidering the new-trial grant because there has been a change in judges (actually, two changes in judges) and litigants legitimately expect that a "change of judges mid-way through a case will not mean going back to square one." *Brengettcy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005) (citation omitted). This is an application of the law of the case doctrine. *Id.* But if the issue presented is not presented in "precisely the same way" as it was to the prior judge, then there is less force to the law of the case doctrine. *Id.* In this case, as explained above, Defendants had no opportunity to respond to Plaintiff's motion for new trial, neither in writing nor in open court. Plaintiff filed the motion, and the Court then granted the new trial in open court without asking for a response from Defendants. Only now has there been an adversarial presentation and an opportunity to be heard, and the Court may now consider Defendants' response and Plaintiff's reply on the motion for new trial.

There is another reason that the Court has a freer hand than it otherwise might in reconsidering the new-trial grant. As described above, in discrediting the testimony of Officer Lucas and the other defense witnesses, the first judge did *not* rely on first-

11

hand observations of the witnesses' demeanor, body language, or tone of voice. Instead, the Court relied on the notion that the purported tip was too good to be true. 9/2 Tr. at 6 (describing the tip's match with the details of the truck and circumstances as a "miracle"). In other words, the first judge relied on a notion of what it viewed as common sense, rather than on in-court observations that this Court did not have the benefit of personally viewing. Because that potential impediment is not at issue, after closely reading the trial testimony and carefully reviewing the arguments of both parties, this Court is well positioned to reconsider the prior ruling.

Defendants' broadest argument is that, in granting the new trial, the Court is not permitted to "second guess" the jury's credibility determinations. R. 154 at 11, R. 164 at 4, R. 195 at 7. This argument over-reads the cases that do advise against weighing witness credibility in considering new-trial motions. Recently, the Seventh Circuit re-emphasized the crucial distinction between motions for judgment as a matter of law versus motions for a new trial. For the former type of motion, a "motion for a judgment as a matter of law can be granted only if the court – after viewing the evidence in the light most favorable to the non-movant – believes that the evidence 'supports but one conclusion – the conclusion *not* drawn by the jury.'" *Mejia v. Cook County*, — F.3d —, 2011 WL 1518878, at *2 (7th Cir. 2011) (quoting *Ryl-Kuchar v. Care Centers*, 565 F.3d 1027, 1030 (7th Cir. 2009)) (emphasis in original). Under that standard, credibility determinations are for the jury, not for the judge. *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 150-51 (2000) (cited by *Schandalmeier-Bartels v. Chicago Park District*, 634 F.3d 372, 376 (7th Cir. 2011)).

12

In contrast, motions for a new trial are governed by a different standard. "In passing on a motion for a new trial, the district court has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth in trial." *Mejia*, 2011 WL 1518878, at *1.[4] Contrary to Defendants' argument, the Seventh Amendment's right to a jury trial – and more specifically, the Re-examination Clause of the Seventh Amendment[5] – is not undermined by that standard. *Gasperini v. Center for Humanities*, 518 U.S. 415, 432-33 (1996) (authority of trial court to grant new trials is "large" and consistent with common-law authority at the time of Seventh Amendment's adoption).

To be sure, as *Mejia* explains, the jury's traditional role of making credibility calls does have a place – but a "limited" one – in considering a motion for new trial. 2011 WL 1518878, at *2. In conducting its own assessment of the evidence presented, the district court "can strike a piece of evidence from its weighing process only if 'reasonable persons could not believe' it because it 'contradicts indisputable physical facts or laws.'" *Mejia*, 2011 WL 1518878, at *2 (quoting *Latino v. Kaizer*, 58 F.3d 310, 315 (7th Cir. 1995)). In other words, a trial judge cannot first remove evidence from the scales (unless no reasonable jury could believe the evidence) and then compare the

---

[4]Additionally, the evidence must be weighed neutrally, rather than in a light favorable to the non-movant. *Mejia*, 2011 WL 1518878, at *2.

[5]The Re-examination Clause of the Seventh Amendment reads, in context: "the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."

weight of the evidence. Admissible evidence must remain on the scales for the weighing process.

With regard to considering the new-trial motion, however, the trial judge does retain the authority to find testimony not credible in light of the manifest weight of the evidence. *Mejia*, 2011 WL 1518878, at *2. A case cited by *Mejia* provides an example: in *United States v. Washington*, which was a criminal case, the Seventh Circuit held that it was within the district court's discretion to find, in deciding a new trial motion, a particular witness's testimony not credible and on that basis grant a new trial. 184 F.3d 653, 657-58 (7th Cir. 1999) (cited by *Mejia*, at *2).[6] To be sure, one might argue that if a trial judge may entirely discredit and entirely discount, down to zero, the testimony of a witness, then the judge has in effect end-run around the admonition that "the district court cannot remove a piece of evidence from the calculus merely because the court believes it was not credible." *Mejia*, 2011 WL 1518878, at *2. But there is a real difference, albeit a subtle one, between simply discrediting an item of evidence at the outset and not weighing it at all with the mix of other evidence, versus considering the item of evidence in light of all the evidence. For example, a trial judge cannot simply declare that a particular witness's testimony was not credible based on the judge's opinion that the witness displayed a shifty in-court demeanor without also

---

[6]It is true that *Mejia* did not explicitly consider whether there was a distinction between Federal Rule of Civil Procedure 59 (and potentially the Re-examination Clause of the Seventh Amendment) versus Federal Rule of Criminal Procedure 33 governing new trials in criminal cases, but the holding of *Mejia* is consistent with the Supreme Court's interpretation of the Re-examination Clause in *Gasperini*, and *Mejia* is in any event binding on this Court.

14

considering the testimony along with all the other evidence – including other evidence that could corroborate or support the witness's testimony. But the same trial judge considering the same new-trial motion *is* permitted to discredit testimony, even in its entirety, so long as the judge has also considered the testimony's credibility (or lack thereof) in light all of the record evidence.[7]

Accordingly, the Court rejects Defendants' broadest argument, namely, that the Court cannot, as a matter of law, discredit a witness's testimony in considering the new-trial motion unless the testimony is indisputable. But Defendants' narrower argument – namely, the jury's verdict is not against the manifest weight of the trial evidence in this case – is correct.[8] Indeed, there was no direct evidence contradicting Officer Lucas's testimony concerning the description of the tip's details, nor was there direct evidence contradicting the more general testimony that supported Lucas's testimony that he had received a tip that day. Instead of countervailing direct evidence, the Court relied on what it viewed as the common-sense notion that the tip

---

[7]That is not to say that a trial judge should take lightly the decision to discredit testimony in its entirety in the course of vacating a jury's verdict. One potential concern is the prospect that the retrial will elicit the same or substantially the same evidence, for then what would the trial judge do at that point if the second jury arrives at the same verdict as the first? That concern is worth bearing in mind, but most re-trials will not be an exact copy of the first trial. *See United States v. Morales*, 902 F.2d 604, 609 (7th Cir. 1990) (cited by *Mejia*, at *2) (noting that, before the second trial, there could be further factual investigation, and at the second trial, the lawyers could do a better job presenting the case). And if the retrial does result in the same verdict as the first trial, the second verdict shall stand except in rare circumstances. *Louisville & N.R. Co. v. Woodson*, 134 U.S. 614, 623 (1890) ("Courts rarely grant a new trial after two verdicts upon the facts in favor of the same party . . . ."))

[8]The appropriate deference owed to the jury is built into the manifest-weight standard. *Mejia*, 2011 WL 1518878, at *3 n.1.

was too good to be true. But there was no actual evidence, let alone a *manifest* weight of evidence, that required the jury to reject the testimony that Lucas had received the tip. Lucas's testimony, combined with Norberg's and Probeski's supporting testimony, was enough evidence for the jury to find that Lucas had in fact received the tip.

A review of the evidence illustrates that the anonymous tip was not too good to be true, and could simply have been provided by someone who mistook the hay for marijuana, or by someone who knew that the truck carried hay but wished to cause Luna or Galvan to be arrested. Any person familiar with Luna's or Galvan's work schedule and with Luna's truck would have been able to provide all of the information in the tip. The hay was loaded into Luna's truck one or two days after Christmas, 8/3 PM Tr. at 13, and the arrest took place on December 30, leaving at least four days' time for someone to observe the hay. The truck was known to be kept very clean. One non-party witness testified that the truck was very nice and always clean. 8/3 PM Tr. at 13-14. Any person who had seen the truck would be able to describe the truck to the police, including its color and how "tricked" it was. Moreover, as for the truck's probable location within a time range, the direction of travel, and the occupants, Galvan testified that he drove home from work that day on the same route he drove everyday, 8/7 AM Tr. at 53-54, that he regularly drove with Luna from work, 8/6 PM Tr. at 169, and that they left work that day at the normal time (5 p.m.), *id.* at 171. This is not to say that the tipster in fact was someone with some familiarity with Galvan or Luna, but it is one plausible conclusion a jury could reach. It is also plausible, or at least not against the manifest weight of the evidence, that there was

indeed a tipster who saw another truck matching the same details, and that Galvan was in the wrong place at the wrong time.

Beyond the witnesses' testimony, the evidence supporting the jury's finding also included the fact that Defendants mentioned the tip in the arrest report. If the tip was an after-the-fact cover-up, the reference to the tip in the arrest report means that Lucas had already started to lay the seeds for the cover-up at a time when the laboratory analysis had yet to show that the bales were not marijuana. And Lucas would have had to think quickly: the arrest occurred at 5:45 p.m., and the officers signed the arrest report at around 8 p.m. later that same evening. Pl. Exh. 24; Def. Exh. 9. On top of that, not only Lucas but also Norberg and Probeski would have had to lie about the tip. To be sure, if the officers did close ranks to fabricate the tip, as the first judge believed, it would not be the first time that law enforcement officers acted in concert to fabricate evidence. But the testimony of Norberg and Probeski did constitute evidence in support of Lucas's testimony concerning the tip and in support of the jury's verdict. Nor was the tip perfect: as recounted by Lucas, the tip's report of the ages of the occupants was indeed wrong. If Lucas wanted to create the perfect tip as an after-the-fact cover-up, then he missed a crucial detail.

Galvan argues that the jury's verdict was against the manifest weight of the evidence because the testimony of the officers was conflicting and inconsistent, both when measured against their own prior testimony or statements and against each other's testimony. R. 197. But the jury could set aside the inconsistencies as a product of the passage of time and the fading of memories. The arrest occurred on December

17

30, 2002. Officers Lucas and Norberg were not deposed until early 2005, more than two years after the arrest. 8/3 PM Tr. at 36. The trial itself did not occur until another 4½ years after those depositions, which was six years after the arrest. The inconsistencies in testimony must be viewed through this lens.

It is true that the officers' testimony and statements do not line up perfectly. For example, Lucas could not recall if he had told Probeski about the tip. Lucas testified that he did not believe he did, but that he might have. Probeski testified that Lucas did tell him about the tip shortly after roll call. While these two accounts are not in precise alignment, they do not actually contradict each other. Lucas did not testify that he definitively did not tell Probeski about the tip; rather, Lucas testified that he did not think he had. This was Lucas's testimony at both his deposition and trial. The jury heard all of the conflicting and inconsistent testimony, bad memories and impeachment and all, and then did precisely what it is called upon to do, which is make a credibility determination that was not manifestly outweighed by other evidence. The jury's verdict must be reinstated.

One last note. Defendants' briefs in support of reconsideration made personal attacks on the first judge. *E.g.*, R. 164 at 4; R. 195 at 8 ("in his zeal to be more than a potted plant"). But there is no question that the first judge endeavored to apply the law to the facts in good faith; the jury could readily have found for Plaintiff, rather than Defendants, in light of the trial evidence. Defendants' personal attacks were a discredit to the presentation of the issues. Defendants have prevailed on the motion to

18

reconsider, but that is because the law and the facts demand it, not because of the personal animus displayed by Defendants' briefs.

## III.

For the reasons stated above, Defendants' motion for reconsideration is granted and the jury's verdict for Defendants is reinstated.

ENTERED:

*Edmond E. Chang*

———————————————
Honorable Edmond E. Chang
United States District Judge

DATE: May 18, 2011